Filed 3/8/21  Protecting Our Water etc. v. County of Stanislaus CA5
Opinion on remand from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PROTECTING OUR WATER & ENVIRONMENTAL RESOURCES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF STANISLAUS et al., <br><br> Defendants and Respondents. | F073634 <br><br> (Stanislaus Super. Ct. No. 2006153) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Law Office of Thomas N. Lippe and Thomas N. Lippe for Plaintiffs and Appellants.

M.R. Wolfe & Associates and Mark R. Wolfe; Law Office of Babak Naficy and Babak Naficy for California Water Impact Network and California Wildlife Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Shute, Mihaly & Weinberger, Matthew D. Zinn, Sarah H. Sigman, Lauren M. Tarpey and Peter J. Broderick; Thomas E. Boze and John P. Doering, County Counsel, for Defendants and Respondents.

Dennis Bunting, County Counsel (Solano)Peter R. Miljanich, Deputy County Counsel, and Jennifer Henning for the California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

-ooOoo-

This matter has been remanded to us from the Supreme Court. The case concerns respondent Stanislaus County's (the County) practice of treating the issuance of all nonvariance well permits as ministerial acts under the California Environmental Quality Act (CEQA or the Act). (Pub. Resources Code, § 21000 et seq.) The Supreme Court held this practice is unlawful because one of the applicable standards for well construction – Standard 8.A of Bulletin No. 74 – confers discretionary authority on the County in at least some instances.

The Supreme Court declined to reconsider conclusions this court made regarding Standards 8.B and 8.C. On remand from the Supreme Court, plaintiffs have asked us to hold that other standards (Standards 8.B and 8.C) likewise confer discretionary authority; and that other purportedly discretionary provisions in Department of Water Resources Bulletin 74 have been incorporated into the Stanislaus County Code.

We hold that Standards 8.B and 8.C do confer discretionary authority in at least some instances but reject plaintiffs' claim that certain other provisions in Bulletin 74 are incorporated into the Stanislaus County Code. Accordingly, we reverse the judgment of the trial court and remand.

## FACTS

I.    History of Water Well Standards in California

In 1949, the Legislature enacted section 231 of the Water Code,[1] which then provided:

> "The department, either independently or in cooperation with any person or any county, state, federal or other agency, shall investigate and survey conditions of damage to quality of underground waters, which conditions are or may be caused by improperly constructed, abandoned or defective wells through the interconnection of strata or the introduction of surface waters into underground waters. The department shall report to the appropriate regional water pollution control board its recommendations for minimum standards of well construction in any particular locality in which

_____

[1] All further statutory references are to the Water Code unless otherwise stated.

2.

it deems regulation necessary to protection of quality of underground water, and shall report to the Legislature from time to time, its recommendations for proper sealing of abandoned wells."[2] (Stats.1949, ch. 1552, p. 2795.)

In 1967, the Legislature enacted sections 13800 through 13806 of the Water Code. (Stats.1967, ch. 323, pp. 1518–1519; see also Stats.1969, ch. 482, pp. 1081–1082.) Those statutes empowered the Department of Water Resources ("DWR"), after completing the studies and investigations described in section 231, to make a determination that a particular area of the state "need[s]" "water well construction, maintenance, abandonment, and destruction standards … to protect the quality of water used." (Stats.1967, ch. 323, p. 1518.) Such a determination would then be reported to the area's regional water quality control board ("regional board"). (*Ibid*.) If the area's regional board concurred in DWR's determination, it was to make a report to the affected counties and cities and transmit any well standards that had been recommended by DWR. (*Ibid*.) The affected counties and cities would then have 120 days to adopt an ordinance establishing "standards of water well construction, maintenance, abandonment, and destruction." (*Ibid*.) If a county or city failed to so adopt an ordinance, the regional board could adopt such standards for the area. (*Id*. at p. 1519.) Standards adopted in that fashion would "have the same force and effect as if adopted as a county or city ordinance." (*Ibid*.)

---

[2] In 1969, the statute's reference to "regional water pollution control board[s]" was changed to "the appropriate California regional water quality control board." (Stats.1969, ch. 482, pp. 1047–1048.) Otherwise, the statute's language remains in effect today as it was enacted in 1949. (See § 231.)

*Bulletin 74-68*

In February 1968, DWR published a document titled, Bulletin No. 74, Water Well Standards: State of California (Bulletin 74-68.)[3]  Bulletin 74-68 stated that it was prepared as part of DWR's compliance with section 231.[4]

Bulletin 74-68 stated DWR's understanding that sections 13800 through 13806 "established a procedure for implementing standards developed under Section 231."

In Bulletin 74-68's foreword, the Director of DWR stated, "The standards presented in this report are issued as guides to good practice for those engaged in the construction of water wells or in the regulation of water well construction and the destruction of abandoned wells in California."  The Director claimed Bulletin 74-68 "fulfill[s] the need for a basic set of standards that are satisfactory under most conditions and which can be modified or expanded to accommodate local variations in geologic or ground water conditions."  The foreword concluded by acknowledging that the standards would need to be revised and updated over time "in light of both changes in practice and the degree of success achieved in their application."

Bulletin 74-68 was organized into three chapters, titled "Introduction," "Standards," and "Destruction of Wells."  Some of the chapters were further divided into parts, and some parts were further divided into sections.  Relevant here, Chapter 2 (Standards) has a Part II titled "Well Construction."  Section 8 of Part II is titled, "Well Location with Respect to Contaminants and Pollutants."  It is this section, as later amended, that takes center stage in the present appeal.

---

[3] This Bulletin did not refer to itself as Bulletin 74-68.  However, subsequent editions are identified as "Bulletin 74-" followed by the last two digits of the year it was published.  For consistency, we will refer to the original Bulletin 74, published in 1968, as "Bulletin 74-68."

[4] A "preliminary edition" of this bulletin was issued in 1962.  The 1962 edition was the first recommended statewide standards for water well construction and sealing.

*Chapter 9.36 of the Stanislaus County Code*

In 1973, Chapter 9.36 of the Stanislaus County Code was enacted.  (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 490 (*Protecting Our Water*).)  It provides that a permit from the county health officer is required to construct, repair, or destroy a water well.  (Stanislaus Co. Code, § 9.36.030.)

Chapter 9.36 establishes several standards for water well construction. It also imports certain standards from Bulletin 74 as follows:

> "Except as may be otherwise provided by this chapter, standards for the construction, repair, reconstruction, or abandonment of wells shall be as set forth in Chapter II of the Department of Water Resources Bulletin No. 74, "Water Well Standards" (February 1968), or as subsequently revised or supplemented, which are incorporated in this chapter and made a part of this chapter."

"Chapter 9.36 also allows for variance permits.  The county health officer 'may authorize an exception to any provision of this chapter when, in his/her opinion, the application of such provision is unnecessary.'  (Stanislaus County Code, § 9.36.110.) When authorizing a variance, the health officer may prescribe 'such conditions as, in his or her judgment, are necessary to protect the waters of the state ….'  (Stanislaus County Code, § 9.36.110.)"  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491.)

*Bulletin 74-81*

DWR updated Bulletin 74 in December 1981.  We refer to this updated bulletin as Bulletin 74-81.  Bulletin 74-81 is a nearly 100-page document which, like its predecessor, is "filled with technical specifications for water wells …."  (See *California Groundwater Assn. v. Semitropic Water Storage Dist.* (2009) 178 Cal.App.4th 1460, 1469.)

Chapter I of Bulletin 74-81, entitled "Introduction," describes the history of well standards in the state.

Chapter II of Bulletin 74-81, entitled "Standards," is split into three parts: "General" (Part I); "Well Construction" (Part II); and "Destruction of Wells" (Part III).

5.

The section 8 standards referenced throughout this opinion are located in Part II of Chapter II.

At the beginning of Chapter II, before even Part I begins, there is a two-paragraph preamble. Relevant here, the first paragraph reads:

> "The standards presented in this chapter are intended to apply to the construction (including major reconstruction) or destruction of water wells throughout the State of California. However, under certain circumstances, adequate protection of ground water quality may require more stringent standards than those presented here; under other circumstances, it may be necessary to substitute other measures which will provide protection equal to that provided by these standards. Such situations arise from practicalities in applying any standards or, in this case, from anomalies in ground water geology or hydrology. Since it is impractical to prepare standards for every conceivable situation, provision has been made for deviation from the standards as well as for additional ones. However, the Department believes that for most conditions encountered in the State, the standards presented in this report are satisfactory for the protection of ground water quality."

After the preamble section, Part I of Chapter II begins.

Section 3 of Part I of Chapter II is entitled. "Exemption Due to Unusual Conditions," and provides:

> "If the enforcing agency finds that compliance with any of the requirements prescribed herein is impractical for a particular location because of unusual conditions or if compliance would result in construction of an unsatisfactory well, the enforcing agency may waive compliance and prescribe alternative requirements which are "equal to" these standards in terms of protection obtained."

Section 5.A. of Part II of Chapter II, provides:

> "In locations where existing geologic or ground water conditions require standards more restrictive than those described herein, such special additional standards may be prescribed by the enforcing agency."

*County's CEQA Regulations*

"In 1983 County adopted its own CEQA regulations which generally classified issuance of all well construction permits as ministerial projects unless the county health officer granted a variance. A variance permit was designated as a discretionary project,

triggering environmental review.  As enacted, County's regulations provided that the issuance of a nonvariance well construction permit was presumed to be ministerial '[i]n the absence of any discretionary provision contained in the relevant ordinance.'  The parties stipulated that County's practice has been to treat *all* nonvariance permit issuances as ministerial.  This practice ignores the quoted clause, which mirrors language in CEQA Guidelines, section 15268, subdivision (b)."  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491.)

*Water Code Section 13801*

In 1986, the Legislature amended section 13801.  (Stats.1986, ch. 1152; see also *California Groundwater Assn. v. Semitropic Water Storage Dist.*, *supra*, 178 Cal.App.4th at pp. 1468–1469.)  As amended, section 13801, subdivision (c) required that counties adopt a water well ordinance "that meets or exceeds the standards contained in Bulletin 74-81" by January 15, 1990.[5]  (§ 13801, subd. (c).)

Through this statute, the Legislature has established the standards in Bulletin 74-81 as the "baseline for local ordinances."  (*California Groundwater Assn. v. Semitropic Water Storage Dist.*, *supra*, 178 Cal.App.4th at p. 1469.)  However, "the Legislature did not adopt Bulletin No. 74-81 as state law."  (*Ibid.*)

The County asserts that Stanislaus County Code section 9.36.150, cited above, complies with section 13801, subdivision (c).

*Bulletin 74-90*

"In 1991, a supplement was issued as bulletin No. 74-90."  (*Protecting Our Water*, *supra*, at p. 490, fn. 5.)  Bulletin 74-90 revised some of the standards contained in Bulletin 74-81.  All other standards in Bulletin 74-81 remain in effect.

---

[5] If they failed to do so, a model ordinance prepared by the State Board of Water Resources would take effect in that jurisdiction on February 15, 1990.  (§ 13801, subd. (d).)

In its "General Introduction," Bulletin 74-90 has a section titled "Limitations of Standards." That section provides, in pertinent part:

"Well standards contained in Bulletin 74-81 together with well standards in this supplement (Bulletin 74-90) are *recommended minimum* statewide standards for the protection of ground water quality. *The standards are not necessarily sufficient for local conditions.* Local enforcing agencies may need to adopt more stringent standards for local conditions to ensure ground water quality protection.

"In some cases, it may be necessary for a local enforcing agency to substitute alternate measures or standards to provide protection equal to that otherwise afforded by DWR standards. Such cases arise from practicalities in applying standards, and from variations in geologic and hydrologic conditions. Because it is impractical to prepare "site-specific" standards covering every conceivable case, provision has been made for deviation from the standards.

"Standards in Bulletin 74-81 and this supplement (Bulletin 74-90) *do not ensure* proper construction or function of any type of well. Proper well design and construction practices require the use of these standards together with accepted industry practices, regulatory requirements, and consideration of site conditions." (Italics added.)

Bulletin 74-90 also revised sections 8 and 9 of Bulletin 74-81.

*Section 8*

"Section 8.A of the bulletin (Standard 8.A) addresses the distance between proposed wells and potential sources of contamination. It requires that all wells "be located an adequate horizontal distance" from those sources. The standard lists separation distances that are generally considered adequate for specific situations. For example, it notes that a well should be located at least 50 feet from any sewer line; 100 feet from any watertight septic tank or animal enclosure; and 150 feet from any cesspool or seepage pit. However, the standard makes clear that the distances are not intended to be rigidly applied. It notes that: "[m]any variables are involved in determining the 'safe' separation distance;" "[n]o set separation distance is adequate and reasonable for all conditions;" and "[d]etermination of the safe separation distance for individual wells

8.

requires detailed evaluation of existing and future site conditions." It also provides that "[c]onsideration should … be given to adequate separation from sites or areas with known or suspected soil or water pollution or contamination." Significantly, it allows the agency to increase or decrease suggested distances, depending on attendant circumstances.

"Standard 8.B provides that, '[w]here possible, a well shall be located up the ground water gradient from potential sources of pollution or contamination.' Under Standard 8.C, '[i]f possible, a well should be located outside areas of flooding.' " (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 490.)

*Standard 9.A*

Standard 9.A requires that the annular surface seal for water wells must extend from ground surface to certain specified minimum depths (e.g., 20 feet below ground surface for agricultural and individual domestic wells.) Standard 9.A permits the enforcing agency to grant exceptions to the listed minimum depths "where the water to be produced is at a depth less than 20 feet." However, in no case may the annular seal extend less than 10 feet below land surface or be less than 10 feet long. If a well is to be located closer to a pollution or contamination source than otherwise allowed by Standard 8, then the annular seal must extend to a minimum depth of 50 feet.

Standard 9.A also provides for exceptions from the general requirement for annular seals to extend from ground surface: "The top of an annular surface seal may be below ground surface in areas where freezing is likely, but in no case more than 4 feet below ground surface." The standard defines "freezing areas" as those were the mean length of the freeze-free period described by the National Weather Service is less than 100 days." The Bulletin observes that those areas generally include portions of Modoc, Lassen, and Siskiyou Counties, as well as portions of the North Lahontan area and the area of Lake Arrowhead.

The top of an annular surface seal can also be below ground where traffic or "other conditions" require, so long as the "seal and casing extend to a watertight and structurally sound subsurface vault, or equivalent feature."  Even in that situation, the top of the annular seal may not be more than 4 feet below ground surface.

*Chapter 9.37*

"In 2014, County's board of supervisors amended Chapter 9.37 to prohibit the unsustainable extraction and export of groundwater. (Stanislaus County Code, § 9.37.040, subd. A.)  The amendment requires that future permit applications satisfy both Chapter 9.36 and Chapter 9.37, unless exempt from the latter.  (Stanislaus County Code, § 9.37.045, subd. A.)"  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 491, fn. omitted.)

II.     Present Litigation

A.     *Trial Court Proceedings*

"In January 2014, plaintiffs filed this action alleging "a pattern and practice" of approving well construction permits without CEQA review.  They assert that all permit issuance decisions are discretionary projects because County can "deny [a] permit or require changes in the project as a condition of permit approval to address concerns relating to environmental impacts."  For example, a permit application could be denied or ordered modified if the distance between the proposed well and a potential contamination source is deemed inadequate (Standard 8.A) or if the proposed well is situated in a flooding area when it could be located elsewhere (Standard 8.C).  Plaintiffs urge that, because determining compliance with Chapter 9.36's standards requires the exercise of subjective judgment, the projects are discretionary.  Plaintiffs seek a declaration that County's practice of approving misclassified permits without environmental review is "unlawful," and seek to enjoin County from issuing any more permits until it changes its policy."  (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 492, fn. omitted.)

10.

The trial court held Stanislaus County's practice of treating all nonvariance well permit issuances as ministerial does not violate CEQA.

B.     *This Court's Original Opinion*

In an unpublished decision filed on August 24, 2018, this court reversed the trial court's judgment.  In that opinion, we focused on section 8(A) of the Bulletin, which provided:  "All water wells shall be located an adequate horizontal distance from known or potential sources of pollution and contamination."  We held that "[d]etermining whether a particular spacing is 'adequate' inherently involves subjective judgment" and therefore the well permit issuances were discretionary under CEQA.

Two footnotes in our prior opinion are important here.

In footnote 8, we discussed Standards 8.B, 8.C, and 9:

> "Appellants also point to provisions in section 8(B), 8(C), and 9. Section 8(B) provides that, "*[w]here possible*, a well shall be located up the ground water gradient from potential sources of pollution or contamination." (Italics added.)  Section 8(C) states that, "*[i]f possible*, a well should be located outside areas of flooding."  (Italics added.)

> " 'Possible' is a more objective standard than 'adequate.'  While determining whether something is 'possible' may require scientific expertise, the ultimate question being asked is objective (i.e., can this be done?) rather than subjective (i.e., should it be done this way?).

> "Next, in section 9, the Bulletin provides for the minimum depths to which a well's annular seal must extend below ground surface.  An annular seal is 'a watertight seal placed between the well casing and the side wall of a drilled hole.' (Stan. Co. Code, § 9.36.020(G).)  For example, the annular seals of individual domestic wells must extend at least 20 feet below ground surface.  But the annular seal requirements do not have an overarching "adequacy" standard.  Instead, the section lists actual "minimum" depths that apply for each type of well, without the qualifying "guidepost" language found in the contamination source spacing section. Limited exceptions to the annular seal depth minimums are allowed in cases of shallow water depth, freezing areas, etc.  But even those exceptions have absolute minimum depths – e.g., 10-foot seal depth when water depth is less than 20 feet; 50-foot seal depth for wells near pollution source; 4-foot seal depth for freezing areas; 4-foot seal depth if subsurface vault or equivalent feature is used.  These annular seal depth provisions are

11.

objective and simply do not involve the scope of discretion provided in the well/pollution source spacing standard."

In footnote 9, we stated: "The parties disagree … as to whether other provisions in the Bulletin are incorporated by section 9.36.150. We need not resolve that issue because we conclude a provision the parties do agree was incorporated – i.e., the contamination source spacing standard – renders the issuance of well permits discretionary."

C.    *Supreme Court Proceedings*

Respondents petitioned for review of our decision in the Supreme Court. Appellants filed an answer to the petition for review, in which they asked the Supreme Court to consider the following issues for review (see Cal. Rules of Court, rule 8.504(c)), including:

> "1. Does Stanislaus' County's local groundwater well permit ordinance incorporate the state Bulletins' general discretionary standards, and thereby confer discretionary authority triggering CEQA review?

> "2. Do the state Bulletins' specific discretionary standards referenced in footnote 8 of the Opinion confer discretionary authority triggering CEQA review?"

In their merits brief filed in the Supreme Court, appellants argued that the standards referenced in footnote 8 of our opinion – i.e., Standards 8.B and 8.C – conferred discretionary authority.

The Supreme Court granted review and issued its decision on August 27, 2020. The Supreme Court held that, "The plain language of Standard 8.A authorizes County to exercise 'judgment or deliberation when [it] decides to approve or disapprove' a permit. (CEQA Guidelines, § 15357.)" (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 496.) Consequently, permit issuances "in which County is required to exercise independent judgment under Standard 8.A cannot be classified as ministerial." (*Id*. at p. 497.) Accordingly, the Supreme Court affirmed our conclusion that the County's blanket ministerial categorization was unlawful.

However, the Supreme Court determined our holding was too broad because Standard 8.A only applies when there is a contamination source "near" a proposed well. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.) Absent a nearby contamination source identified during the permit approval process, the issuance of a construction permit may be ministerial.[6] Therefore, the court held that while plaintiffs were entitled to a judicial declaration that the County's blanket ministerial categorization is unlawful, they were not entitled to a declaration that well permit issuances are always discretionary because of Standard 8.A.

After observing Standard 8.A would be implicated in some, but not all, permit applications, the Supreme Court said, "[t]he same principle would apply to Standards 8.B and 8.C." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500.) However, the court "declined to determine whether those provisions [i.e., Standards 8.B and 8.C] confer discretionary authority in some instances." (*Ibid*.) The court concluded that it need not address that issue in light of its conclusions regarding the authority granted by Standard 8.A.

The court continued,

> "Even if Standards 8.B and 8.C might be understood to grant discretionary authority in some cases, we could not conclude that they would always do so. Standard 8.B only applies when a proposed well is downhill from a contamination source. Standard 8.C is only implicated when a proposed well is in a flood area. In other words, like Standard 8.A, Standards 8.B and 8.C may or may not be involved in the issuance of a particular permit." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 500, fn. omitted.)

---

[6] The Supreme Court did not reach the issue of what constitutes "near" for purposes of this rule. Determining what distance is sufficiently "near" to make Standard 8.A *applicable* would likely involve some of the same discretionary considerations used to determine whether that same distance is "adequate" to *satisfy* Standard 8.A.

Regardless, the Supreme Court's opinion seems clear that if it is determined as a preliminary matter that a well is not "near" its closest contamination source and no other discretionary decision is involved – then the County may proceed with a ministerial permit issuance.

At the conclusion of that excerpt, the opinion includes the following footnote:

"Plaintiffs have also asked us to review whether (1) any other standards in Bulletin No. 74 are incorporated into Chapter 9.36 and (2) the inclusion of those standards makes permit issuance discretionary. The Court of Appeal declined to address these questions because it found that the discretion conferred by Standard 8.A made permit issuance a discretionary project. These questions should be answered by the Court of Appeal on remand in the first instance." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 501, fn. 11.)

The Supreme Court noted that "the fact that an individual project is classified as discretionary does not mean that full environmental review, including an EIR, will always be required. The project may qualify for another CEQA exemption or the agency may be able to prepare either a negative declaration or a mitigated negative declaration after its initial study. Any of these circumstances would obviate the need for an EIR." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 501.)

The Supreme Court concluded plaintiffs are entitled to a declaratory judgment stating the County's blanket ministerial categorization is unlawful. (*Protecting Our Water*, *supra*, 10 Cal.5th at pp. 501–502.) However, plaintiffs are not entitled to a judicial declaration that all permit issuance under Chapter 9.36 are discretionary; nor are they entitled to an injunction requiring County to treat all such permit issuances as discretionary. (*Id.* at p. 501.)

Finally, the opinion concludes by directing that "[t]he matter is remanded to the Court of Appeal for it to evaluate the questions it declined to answer and to reassess plaintiffs' entitlement to relief." (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 502.)

**DISCUSSION**

I.     Summary of Issues

Each party filed a brief on remand. (See Cal. Rules of Court, rule 8.200(b).) Plaintiffs make two contentions: (1) that Standards 8.B and 8.C confer discretion that may require application of CEQA to water well construction permits; and (2) the County Code incorporates other portions of the Bulletin, rendering the County's decisions on

14.

well permits discretionary. Respondents argue plaintiffs first contention exceeds the scope of remand and contravenes the law of the case doctrine. Respondents acknowledge plaintiffs second argument comes within the scope of remand, but contend it is meritless.

We reject plaintiffs' claim that the Stanislaus County Code incorporates certain other excerpts of Bulletin 74. However, we conclude Standards 8.B and 8.C confer discretion in at least some circumstances.

A. *The Stanislaus County Code does not Incorporate Other Portions of Bulletin 74 Identified by Plaintiffs*

The parties dispute whether certain provisions found in Bulletin No. 74 are incorporated into the county code. That question is controlled by Stanislaus County Code section 9.36.150, which establishes the County's "standards for the construction, repair, reconstruction, or abandonment of wells" as those "set forth in Chapter II of the Department of Water Resources Bulletin No. 74…." (Stanislaus County Code, § 9.36.150.) In order to resolve the questions presented here, we need to flesh out the definition of the phrase, "standards for the construction, repair, reconstruction, or abandonment of wells."

As the term is commonly used, a "standard" is "something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality." ("Standard." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/standard, accessed Dec. 23, 2020.)

Here, we are dealing with a specific type of standard: standards *for* the *construction*, *repair*, *reconstruction*, or *abandonment* of wells." (Stanislaus County Code, § 9.36.150; see also § 231 [directs DWR to report its recommendations for "minimum standards *of well construction*" (italics added)]; Bulletin 74, Ch. II ["The standards presented in this chapter are intended to *apply to the construction (including major reconstruction) or destruction of water wells*…." (Italics added)].)

Undisputed examples of standards include Bulletin 74's requirements for the thickness of materials used in well casing; and approved materials to be used for grouting. For example, sealing material must consist of "neat cement grout, sand-cement grout, bentonite clay, or concrete." Another standard provides that steel conductor casing for community water supply wells must be six millimeters thick if a single casing is used and must be No. 10 U.S. standard gage or thicker if a double casing is used.

We believe a straightforward definition of "standards for the construction, repair, reconstruction, or abandonment of wells" can be derived from the general definition of the word "standard"; its present usage in the context of well construction; and the undisputed examples of actual standards. We conclude the phrase is best defined as: *the set of prescribed methods and materials to be employed* in the construction, repair, reconstruction, or abandonment of water wells.

It is important to note this working definition of standard includes both rigidly fixed requirements that establish a single, precise method or measurement that must be used; *and* requirements expressed as a range of acceptable methods or measurements. Moreover, standards can also be either quantitative or qualitative.

For example, Bulletin 74-68 establishes a ranged, quantitative standard by requiring that the thickness of well seals "shall be at least two (2) inches, and not less than three (3) times the size of the largest coarse aggregate used in the sealing material." Additionally, Bulletin 74-81 sets forth a qualitative standard by requiring that "sealing material shall be applied, where possible, in one continuous operation from the bottom of the interval to be sealed to the top." Both are "standards" for well construction.

It is also important to note what this definition excludes from its scope. Specifically, the concept of a "standard[] for the construction, repair, reconstruction, or abandonment of wells" (Stanislaus County Code, § 9.36.150), does not include discussions or comments about the general *topic* of standards. Such discussions do not themselves establish an actual rule or requirement prescribing a method or material to be

16.

employed in well construction, repair, reconstruction or abandonment.  That is not to deny that these discussions or comments may be quite important.  It is only to say that they are not *standards* for the construction, repair, reconstruction or abandonment of wells, and therefore are not incorporated by Stanislaus County Code section 9.36.150.

1.  Chapter II Preamble

For example, plaintiffs cite the first paragraph of Chapter II's preamble and identify it as a "standard."  That paragraph reads:

> "The standards presented in this chapter are intended to apply to the construction (including major reconstruction) or destruction of water wells throughout the State of California.  However, under certain circumstances, adequate protection of ground water quality may require more stringent standards than those presented here; under other circumstances, it may be necessary to substitute other measures which will provide protection equal to that provided by these standards.  Such situations arise from practicalities in applying any standards or, in this case, from anomalies in ground water geology or hydrology.  Since it is impractical to prepare standards for every conceivable situation, provision has been made for deviation from the standards as well as for additional ones.  However, the Department believes that for most conditions encountered in the State, the standards presented in this report are satisfactory for the protection of ground water quality."

As its text makes clear, this paragraph is not a standard itself.  It is not a rule for the methods or materials employed in well construction.  Instead, the paragraph is a broad discussion of the occasional need for different standards than those presented in the bulletin.  The paragraph is clearly meant to preface the actual standards that follow in the operative "Parts" of Chapter II.

This clear import of the text is also supported by other considerations.  The preamble paragraph repeatedly references the "standards" as something outside of itself.  Indeed, the paragraph begins, "The standards presented in this chapter …."  Additionally, the preamble paragraph is located at the beginning of the chapter, before even Part I and the definitions section begin.

17.

2.      General Introduction of Bulletin 74-90

Similarly, plaintiffs also cite to a portion of the General Introduction of Bulletin 74-90:

> "Well standards contained in Bulletin 74-81 together with well standards in this supplement (Bulletin 74-90) are recommended *minimum* statewide standards for the protection of ground water quality. *The standards are not necessarily sufficient for local conditions.* Local enforcing agencies may need to adopt more stringent standards for local conditions to ensure ground water quality protection.

> "In some cases, it may be necessary for a local enforcing agency to substitute alternate measures or standards to provide protection equal to that otherwise afforded by DWR standards. Such cases arise from practicalities in applying standards, and from variations in geologic and hydrologic conditions. Because it is impractical to prepare "site-specific" standards covering every conceivable case, provision has been made for deviation from the standards.

> "Standards in Bulletin 74-81 and this supplement (Bulletin 74-90) *do not ensure* proper construction or function of any type of well. Proper well design and construction practices require the use of these standards together with accepted industry practices, regulatory requirements, and consideration of site conditions."

In several respects, this excerpt is similar to the preamble of Chapter II addressed above. It does not establish or prescribe any methods or materials for well construction, but rather broadly discusses the potential need for different standards in certain situations.

Again, this clear import of the text is further supported by other considerations. The excerpt repeatedly references the "standards" as something outside of itself. Moreover, the excerpt appears in the "General Introduction" of Bulletin 74-90, well before the substantive section entitled, "Standards." The location of this excerpt outside Chapter II has special force considering that section 9.36.150 only incorporates certain standards "set forth in Chapter II." (Stanislaus County Code, § 9.36.150.)

18.

### 3. Section 3, Part II of Bulletin 74

Next, we examine section 3 of Part II, entitled "Exemption Due to Unusual Conditions":

> "If the enforcing agency finds that compliance with any of the requirements prescribed herein is impractical for a particular location because of unusual conditions or if compliance would result in construction of an unsatisfactory well, the enforcing agency may waive compliance and prescribe alternative requirements which are "equal to" these standards in terms of protection obtained."

We conclude this is not a "standard[] for the construction, repair, reconstruction, or abandonment of wells" and is therefore not incorporated into the county code by virtue of Stanislaus County Code section 9.36.150. The provision does not establish a rule for any specific aspect of well construction. It does not describe how any portion of the well construction process must be performed, nor does it prescribe particular materials that must be used in construction. Instead, it is a broad acknowledgment by DWR that enforcing agencies should have the flexibility to establish alternative standards where conditions require.

Moreover, even if this provision had been incorporated into the county code, plaintiffs would not be entitled to relief on that basis. The county code already provides that the county health officer may authorize exceptions to well standards when application of the provision is "unnecessary." (Stanislaus County Code, § 9.36.110.) In such circumstances, the health officer can issue a variance permit and prescribe conditions "necessary to protect the waters of the state from pollution." (*Ibid.*) Importantly, the County already performs CEQA review of applications for variance permits. On the record before us, it remains entirely possible that even if section 3 were deemed incorporated into the county code, respondents would have viewed it as eliciting a discretionary decision (as respondents do with variance permit applications.) Plaintiffs have not shown that any applicants have sought an "alternative requirement[]" under section 3 or that respondents have a policy of treating such requests as prompting

19.

ministerial decisions. Accordingly, declaratory relief on this issue would not have been "necessary or proper at this time under all the circumstances." (Code Civ. Proc., § 1061.)

### 4. Water Code Section 13801

Plaintiffs suggest that Stanislaus County Code section 9.36.150 incorporates the above-described provisions "because it must" under section 13801. (Cf. *Simpson v. Hite* (1950) 36 Cal.2d 125, 131.) They argue that section 13801 does not distinguish between qualitative and quantitative standards. However, our holding is not based on our classification of these provisions as qualitative or quantitative. Rather, we conclude they are not "standards" at all. Instead, they are discussions *about* standards. They do not themselves prescribe any methods or materials for well construction. And since section 13801, subdivision (c) only speaks to "standards," it does not require incorporation of these provisions into local ordinances.

Moreover, even if section 13801 had required incorporation of these provisions, and the County failed to comply with that requirement, the argument would not go as far as plaintiffs need. The consequence of a county failing to adopt an ordinance in compliance with section 13801, subdivision (c) is *not* enactment of Bulletin 74 in the jurisdiction or reformation of the local ordinance to incorporate all provisions in Bulletin 74. Instead, the consequence would be application of a "model ordinance" prepared by the State Board of Water Resources in the jurisdiction. (§ 13801, subd. (d).) Plaintiffs have not shown whether the "model ordinance" contains the provisions from Bulletin 74 discussed above (or analogous provisions).[7]

---

[7] Because we conclude these provisions are not incorporated into the Stanislaus County Code, plaintiffs' arguments premised on incorporation necessarily fail.

20.

II.     Standards 8.B and 8.C Confer Discretion in At Least Some Circumstances

        A.      *This Issue is Cognizable on Remand*

Appellants contend Standards 8.B and 8.C confer discretion, while respondents insist the issue is "beyond the scope of the issues on remand" and cannot be revisited under the law of the case doctrine.

                1.      Footnote 8 of This Court's Original Opinion Did Not Establish Law of the Case

The law of the case doctrine provides that " 'when, in deciding an appeal, an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal." ' [Citation.]" (*Quackenbush v. Superior Court* (2000) 79 Cal.App.4th 867, 874.)  By its own terms, the doctrine does not apply to dicta.  (9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 474; see also *DeMirjian v. Ideal Heating Corp.* (1954) 129 Cal.App.2d 758, 764.)

Respondents argue our statements regarding Standards 8.B and 8.C in footnote 8 of our original opinion established law of the case that cannot be revisited.  However, as footnote 9 of our opinion made clear, determining the impact of standards other than 8.A was not material to our decision because Standard 8.A, standing alone, rendered the permit decision discretionary.  Consequently, our comments regarding Standards 8.B and 8.C were dicta in that they were "unnecessary to the decision in the case ...."  (Black's Law Dictionary (11th ed. 2019), "obiter dictum".)  Because the comments were dicta, they did not establish law of the case.  (See *Quackenbush v. Superior Court*, *supra*, 79 Cal.App.4th at p. 874; *DeMirjian v. Ideal Heating Corp.*, *supra*, 129 Cal.App.2d at p. 764; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 474.)

                2.      We Have Jurisdiction to Reassess Standards 8.B and 8.C

Respondents also suggest that revisiting Standards 8.B and 8.C. would exceed the scope of remand from the Supreme Court.  We disagree.

In reviewing a lower court's decision, the Supreme Court "may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had." (Code Civ. Proc., § 43.) When the Supreme Court remands with instructions, those directives "define[] the scope of the jurisdiction of the court to which the matter is returned." (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701.)

Here, the Supreme Court's opinion included an express directive that we "reassess plaintiffs' entitlement to relief" on remand. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 502.) We understand that to mean that we are to *re*-assess the issues that bear on plaintiffs' entitlement to relief, so long as our reassessment is consistent with the Supreme Court's opinion. That would include whether Standards 8.B and 8.C confer discretion under the analytical framework established by the Supreme Court's opinion.

Respondents argue, and we agree, the Supreme Court did not "disturb" our previous conclusions regarding Standards 8.B and 8.C. But that is not precisely the same issue as whether we have jurisdiction to revisit those conclusions on remand. While, the Supreme Court did not "disturb" our conclusions, neither did they endorse them. To the contrary, the Supreme Court (1) expressly declined to decide whether Standard 8.B and 8.C "confer discretionary authority in some instances" (*Protecting Our Water*, *supra*, 10 Cal.5th at pp. 500–501) and (2) openly acknowledged the possibility they might confer discretionary authority in some instances. (*Id*. at p. 501 ["Even if Standards 8.B and 8.C might be understood to grant discretionary authority in some cases ...."].) In sum, the Supreme Court's decision to neither "disturb" nor affirm our conclusions regarding Standards 8.B and 8.C does not limit the jurisdiction conferred by the directive to reassess plaintiffs' entitlement to relief.

B.      *Standards 8.B and 8.C Confer Discretion in at Least Some Cases*

When we initially considered Standards 8.B and 8.C, we evaluated them in the abstract. However, the Supreme Court's decision makes clear that the relevant question

22.

is not whether a standard implies discretion in the abstract, but whether it would give the County discretionary authority in "at least *some* circumstances" in which it would be applied. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495, italics added; see also *id.* at p. 499 ["in at least some circumstances."].) If so, the program cannot be categorically classified as ministerial.

Applying that framework, we conclude Standards 8.B and 8.C may confer discretion in at least some circumstances.

Standard 8.B's primary directive is that wells shall be located up the ground water gradient from contamination sources where possible. Later, the standard provides: "However, consideration should be given that the gradient near a well can be reversed by pumping … or by other influences." Thus, the application of Standard 8.B could, *in at least some cases*, involve discretion to determine what should be done if a reversed gradient or "other influences" on the gradient are present at a proposed well site.

Similarly, Standard 8.C primarily provides that wells should be located outside of flood areas, if possible. This standard further requires that the top of the well casing terminate (1) above grade and (2) above known levels of flooding cause by drainage or runoff. However, if compliance with this provision is "not practical, the enforcing agency shall require alternate means of protection."

It is readily apparent that application of Standard 8.C will, *in at least some cases*, involve discretionary decisions by the County. First, the determination of whether it is "practical" to comply with the well casing relative height requirements could easily involve a subjective determination regarding what measures are likely to be effective, and how difficult such measures would be to implement. Such decisions would not involve straightforward application of objective standards, but rather a range of discretionary options. Second, setting the "alternate means of protection" might often involve a subjective decision as to which measures would sufficiently protect the well (and the

23.

broader environment) from problems caused by drainage or runoff moving over the top of the well casing.[8]

Because Standards 8.B and 8.C confer discretion in at least some of the circumstances to which they apply, it is unlawful for the County to treat *all* nonvariance permit issuances as ministerial acts.[9]

## CONCLUSION

The law in this area arises from a patchwork of sources spanning decades. It involves state statutes being applied to local codes, which in turn incorporate provisions from a state bulletin as required by yet other state statutes. As a result, unintended consequences abound. For one, it seems readily apparent that certain provisions in Bulletin 74 were initially designed to offer flexibility to local jurisdictions, but now have the effect of invoking CEQA and its substantial administrative and cost burdens. We cannot say the drafters of Bulletin 74 would have anticipated this effect. However, it is clear that CEQA applies nonetheless. We are ever reminded that this court's limited role is to state the law as it is. (Code Civ. Proc., § 858.)

## DISPOSITION

The judgment is reversed and the matter remanded. The trial court is directed to consider plaintiffs' prayer for attorney fees in the first instance. The trial court is further directed to enter a judgment in favor of plaintiffs that is consistent with this opinion and

---

[8] Similarly, Standard 9.A.1 confers discretion to enforcing agencies to allow shorter seal depths than otherwise required. It is true that this discretion may only be invoked when the water to be produced by the well is at a depth less than 20 feet. Additionally, the discretion is restricted in that the enforcing agency cannot permit an annular seal depth of less than 10 feet. However, the crucial fact remains that Standard 9.A confers discretion in at least *some* of the circumstances to which it applies.

[9] However, even projects classified as discretionary may not always require an EIR. (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 501.) "The project may qualify for another CEQA exemption or the agency may be able to prepare either a negative declaration or a mitigated negative declaration after its initial study. Any of these circumstances would obviate the need for an EIR." (*Ibid.*)

24.

which declares unlawful the County's practice of treating all issuances of nonvariance well permits as ministerial acts under CEQA. However, the judgment shall not declare that all nonvariance well permits are discretionary under CEQA, nor shall the judgment include injunctive relief. (*Protecting Our Water*, *supra*, 10 Cal.5th at pp. 487, 501.)

Plaintiffs shall recover their costs on appeal.

POOCHIGIAN, Acting P.J.

WE CONCUR:

FRANSON, J.

PEÑA, J.